# EXHIBIT 1

ARBITRATION CONDUCTED PURSUANT TO THE COMMERCIAL ARBITRATION
RULES OF THE AMERICAN ARBITRATION ASSOCIATION


AAA Case No. 01-21-0016-0974

VOICE TELE SERVICES INC.

(CLAIMANT)

- versus -

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA

(RESPONDENT)

---

**FINAL AWARD**

---

**Mark C. Morril**
**Sole Arbitrator**


April 7, 2023

## Table of Contents

I.     Introduction ........................................................................................................................ 5

II.    The Parties ......................................................................................................................... 5

III.   The Tribunal ....................................................................................................................... 6

IV.    Arbitration Agreement, Applicable Law, and Rules ..................................................... 6

V.     Procedural History ........................................................................................................... 8

   A.   Pleadings ......................................................................................................................... 8

   B.   The Parties' Prayers for Relief ...................................................................................... 8

      1)   VTS ............................................................................................................................. 8

      2)   NUFIC ........................................................................................................................ 8

   C.   Procedural Milestones in the Arbitration .................................................................... 9

   D.   The Parties' Prehearing Submissions ......................................................................... 10

   E.   The Evidentiary Hearing .............................................................................................. 10

   F.   Post-Hearing Submissions ........................................................................................... 11

VI.    Facts of the Case .............................................................................................................. 11

   A.   VTS and its Business .................................................................................................... 11

   B.   The 2019 Policy ............................................................................................................. 13

     The 2019 Policy Application Process ................................................................................ 13

   C.   The 2020 Policy ............................................................................................................. 16

     The 2020 Policy Renewal Process ..................................................................................... 16

   D.   VTS's Buyers and Business Operations ..................................................................... 18

     VTS's Operations in the 2019 Policy Period .................................................................... 18

   E.   VTP and Blue Elephant ................................................................................................ 19

   F.   Other Receivables Transactions and Collections Action .......................................... 21

   G.   Possible Identity Theft ................................................................................................. 22

   F.   VTS's Insurance Claim ................................................................................................ 23

VII.   Issues to Be Determined ................................................................................................. 31

     Issue 1 .............................................................................................................................. 32

     Did VTS intentionally conceal or misrepresent facts from NUFIC during the 2020 Policy application process? ... 32

Issue 2...............................................................................................................................................32

Did NUFIC fulfill any duties it may have had to VTS in NUFIC's underwriting of the 2020 Policy?......................32

**VIII.    Discussion** .....................................................................................................................**32**

   A.    Issue 1: Did VTS intentionally conceal or misrepresent facts from NUFIC during the 2020 Policy application process?...............................................................................................................................32

**1)    Parties' Positions** ..............................................................................................................**32**

VTS ...................................................................................................................................................32

NUFIC ..............................................................................................................................................34

**2)    Discussion** .........................................................................................................................**36**

Issue 1 ..............................................................................................................................................36

   c.    Materiality and the Consequences of VTS's Omissions and Misrepresentations.........................42

**B.    Issue 2: Did NUFIC fulfill any duties it may have had to VTS in NUFIC's underwriting of the Policy?** .......................................................................................................................................**44**

   1)    Parties' Positions ...............................................................................................................44

   2)    Discussion ..........................................................................................................................45

**C.    Issues Not Reached**..............................................................................................................**48**

**IX.    Fees and Costs** .............................................................................................................. **49**

**A.    The Parties' Positions** .........................................................................................................**49**

**B.    Tribunal's Analysis** .............................................................................................................**49**

**X.    Final Award** .................................................................................................................... **53**

**AWARD**.................................................................................................................................**53**

Table of Abbreviations

| VTS or Claimant | Voice Tele Services Inc. |
|---|---|
| NUFIC or Respondent | National Union Fire Insurance Company of Pittsburgh, PA |
| VTP | VTP Communications, Inc. |
| VF | Voice Funding |
| Blue Elephant | Blue Elephant Financing, LLC |
| 2020 Policy or Renewal Policy | Policy No. 16483374-20, dated July 6, 2020, issued by National Union Fire Insurance Company of Pittsburgh to Voice Tele Services, Inc. |
| CX- [number] | Claimants' Exhibit |
| CPostHB | Claimants' Post-Hearing Brief |
| RX- [number] | Respondent's Exhibit |
| CPreHB | Claimants Prehearing Memorandum |
| CPreHBR | Claimants' Reply Prehearing Memorandum |
| RPreHB | Respondent's Prehearing Memorandum |
| RPreHBR | Respondent's Reply Prehearing Memorandum |
| [name] Stmn't-I | Initial witness statement of [name] |
| [name] Stmn't-II | Supplemental witness statement of [name] |
| RPostHB | Respondents' Post-Hearing Brief |
| Overlapping Buyers | Red Phone Consulting, Wagner Telecommunications, and LDI Networks, each of whom was a customer of both VTS and VTP |
| Claimed Buyers | Ten VTS Buyers who were the subject of VTS's claims under the 2020 Policy |

I, THE UNDERSIGNED SOLE ARBITRATOR, having been designated in accordance with the arbitration agreement dated July 6, 2020, having been duly sworn, and having duly heard the proofs and allegations of the Parties, do hereby AWARD as follows:

## I.      Introduction

1. This arbitration addresses the validity of insurance claims under a certain Domestic and Export Credit Insurance Policy that the Respondent issued to the Claimant in 2020.  I find that as the result of omissions and misrepresentations in Respondent's answers to specific questions on the 2020 Policy application and related documents, the 2020 Policy is void.  It follows that Respondent is not required to pay the claims or to return the premiums that Claimant paid.

2. It is appropriate to note at the outset of this Final Award that the Sole Arbitrator was highly impressed by the quality of both Parties' submissions and the skillful presentations by both sets of counsel.  To the extent that any claim or defense did not prevail here, it was not a reflection of the quality of the advocacy, but, rather, solely the result of the Sole Arbitrator's considered views on the merits.

## II.     The Parties

3. Claimant VTS is a Pennsylvania corporation with its principal place of business at 1701 Walnut Street, 8th Floor, Philadelphia, PA 19103.  VTS is a registered telecommunications provider with the Federal Communications Commission.  Its business is described in further detail below.

4.  Respondent NUFIC is a Pennsylvania insurance company with its principal place of business at 1271 Avenue of the Americas, New York, New York 10020.  It is a member of the American International Group, Inc. ("AIG").

5

### III.     The Tribunal

5.   In accordance with the Parties' arbitration agreement, including the modifications described below, and the Commercial Arbitration Rules of the American Arbitration Association, the appointment of Mr. Mark C. Morril as the Sole Arbitrator was confirmed on or about December 2, 2021.  Mr. Morril's contact details are as follows:

> Mark C. Morril
> MorrilADR LLC
> 212-410-1771
> Mark.morril@morrilADR.com

### IV.     Arbitration Agreement, Applicable Law, and Rules

6.   The jurisdiction of the Tribunal is derived from Endorsement 5 to Article VI.C of Policy No. 16483374-20, issued to the Claimant by the Respondent (the "2020 Policy") on or about July 6, 2020, which contains the Parties' arbitration agreement, as follows:

> C. ARBITRATION:
> Should any dispute arise between the insured and the Company under this policy which cannot be settled amicably, the matter in dispute shall be referred to three persons in New York, one to be appointed by each of the parties hereto, and the third by the two so chosen who shall act as chairman of the proceedings. Should either the insured or the Company fail to appoint an arbitrator or should the two arbitrators so chosen fail to agree on a third arbitrator, then the parties to the arbitration shall apply to the appropriate federal or state court in New York City for the appointment of such arbitrator. The decision of the arbitrators, or that of any two of them, shall be final and conclusive of all disputes and controversies between the insured and the Company relating to the matters in issue. No award of the arbitrators or judgment of any court with respect to any award, dispute or controversy shall be entered in an amount exceeding the applicable limits set forth in this policy.

7.   The foregoing arbitration clause was superseded by Endorsement 5 to the Policy:

> C. ARBITRATION:
> Should any dispute arise between the insured and the Company under this policy, either may make written demand upon the other to submit the dispute for arbitration. The arbitration proceedings shall take place in the state shown in Item 1 of the Policy Declarations. The insured and the Company must notify the other of the competent appraiser each has selected. The two appraisers will promptly choose

6

a competent and impartial umpire. Should either the insured or the Company fail to appoint an appraiser or should the two chosen fail to agree upon an umpire, then the parties to the arbitration shall apply to the appropriate federal or state court in the state shown in Item 1 of the Policy Declarations for the appointment of such appraiser. Each appraiser will separately state in writing the amount of the loss. If the appraisers submit a written report of agreement on the amount of the loss, the agreed amount will be binding upon the insured and the Company. If the appraisers fail to agree, the appraisers will promptly submit their differences to the umpire. A decision agreed to by one of the appraisers and the umpire will be binding upon the insured and the Company. Each party shall bear the expenses of its designated appraiser and shall jointly and equally share with the other the expense of the umpire and of the arbitration. Except as specifically provided, nothing in this article is intended to or shall in any manner limit or restrict the rights of the insured or the Company or confer any rights to the insured or to the Company. No award of the arbitrators or judgment of any court with respect to any award, dispute or controversy shall be entered in an amount exceeding the applicable limits set forth in this policy.

8.   It is undisputed that the foregoing Arbitration Agreement was further amended and/or supplemented by the AAA's letter to the Parties dated August 18, 2021, which confirmed the Parties' agreement that the arbitration would be administered by the American Arbitration Association under its Commercial Arbitration Rules. By letter dated September 2, 2021, the Parties advised the AAA that they would attempt in good faith to jointly designate a sole arbitrator to hear the case.  Thereafter the Parties agreed to designate Mark C. Morril as the sole arbitrator.

9.   The Parties also agreed, as confirmed in Procedural Order No. 1 in this arbitration, that pursuant to Article VI (G) of the Policy, construction, validity, and performance of the 2020 Policy is governed by and construed in accordance with the laws of the State of New York. Further, the Parties agreed that the Federal Arbitration Act would govern the arbitration process, together with New York law, the Commercial Arbitration Rules (effective October 1, 2013) of the American Arbitration Association, including the Procedures for Large, Complex Commercial Disputes, and such agreements as the Parties might reach and rulings and procedural orders that the Arbitrator might issue regarding matters of procedure.

10.  The seat of the Arbitration is New York City, as provided in the above-referenced arbitration agreement, including the AAA's August 18, 2021 letter to the Parties.

## V.    Procedural History

### A.  Pleadings

11. VTS filed a Statement of Claim dated August 10, 2021.

12. NUFIC filed an Answer to Claimant's Statement of Claim dated September 10, 2021.

### B.  The Parties' Prayers for Relief

### 1)  VTS

13. VTS sought an award:

   a.  Awarding damages of "no less than $2,559,057.48" on its breach of contract and contract reformation claims;

   b.   Awarding damages of "at least $250,000" in the premiums VTS paid to NUFIC on its unjust enrichment claim;

   c.  Reimbursing its costs and fees in the arbitration; and

   d.  Such other and further relief as the arbitrator would deem necessary and proper.

### 2)  NUFIC

14. NUFIC sought an award:

   a.  Denying VTS's request for relief in its entirety and dismissing all of VTS's Claims with prejudice;

   b.  Declaring that NUFIC's denial of VTS's Claims was justified as a matter of contract, law, and equity;

   c.  Declaring that the 2020 Policy is void based on VTS's intentional misrepresentation, concealment, and/or non-disclosure of material facts, and that, accordingly, (i) VTS's Claims are not entitled to coverage, and (ii) the premiums paid under the 2020 Policy are forfeited;

   d.  Denying VTS's request for its costs and fees in this Arbitration;

   e.  Awarding NUFIC all of its fees and expenses in defending this Arbitration; and

   f.  Ordering any further or other relief the Tribunal considers appropriate.

8

### C.  Procedural Milestones in the Arbitration

15. The Sole Arbitrator conducted a preliminary hearing conference by Zoom videoconference on January 6, 2022.  The conference followed an agenda that the Sole Arbitrator had distributed to the Parties in advance.

16.  On January 20, 2022, the Sole Arbitrator issued Procedural Order No. 1.  The order provided, among other things, a Procedural Timetable for the arbitration, a process for the resolution of document disclosure disputes, provision for the direct testimony of fact and expert witnesses to be submitted in the form of written witness statements and written expert reports respectively, and an in-person merits hearing scheduled for October 18-21, 2022.

17. By their separate letters dated April 27, 2022, the Parties advised the Sole Arbitrator that after meeting and conferring, they had reduced the number of document production disputes that that the Sole Arbitrator would be required to determine.  Each Party submitted its remaining disclosure disputes by letter with accompanying Stern Schedules.  On May 13, 2022, the Sole Arbitrator provided rulings on these disputes.

18. The Sole Arbitrator conducted a final Preliminary Hearing Conference on September 29, 2022.

19. On October 25, 2022, the Sole Arbitrator issued Procedural Order No. 2, which provided a schedule for post-hearing submissions.  The order noted that at the conclusion of the merits hearing on October 20, 222, both Parties had confirmed that they had no further proofs to offer or witnesses to be heard.  The order also provided that the hearing record would remain open for receipt of the Parties' post-hearing submissions.

20. On November 21, 2022, the Sole Arbitrator approved the Parties' agreement in respect to submissions to support their costs applications, which would be admitted into the record when submitted.

**D. The Parties' Prehearing Submissions**

21. The Parties made simultaneous submissions of their Pre-Hearing Memoranda on September 16, 2022.

22. VTS submitted the following witness statements and expert reports:

- Witness Statement of Mr. Arkady Sorokin dated June 27, 2022

- Rebuttal Witness Statement of Mr. Arkady Sorokin dated July 18, 2022

- Witness Statement of Mr. Leonid Baranchuck dated June 27, 2022

- Expert Report of William J. Warfel dated July 29, 2022

- Rebuttal Expert Report of William J. Warfel dated August 19, 2022

- Rebuttal Expert Report of Arkady Sorokin dated August 19, 2022

23. NUFIC submitted the following witness statements and expert reports:

- Witness Statement of Kate Meza dated June 27, 2022

- Second Witness Statement of Kate Meza dated July 18, 2022

- Witness Statement of Craig Bergmann dated June 27, 2022

- Second Witness Statement of Craig Bergmann dated July 18, 2022

- Witness Statement of Peter Pender-Cudlip dated June 27, 2022

- Expert Report of Jochen Duemler dated June 27, 2022

- Rebuttal Expert Report of Jochen Duemler dated August 19, 2022

- Expert Report of David P. Frankel dated July 29, 2022

**E. The Evidentiary Hearing**

24. The evidentiary hearing took place in person on October 19 and 20, 2022 at the American Arbitration Association in New York City. Some persons at the hearing and some witnesses appeared by Zoom videoconference by agreement of the Parties and the Sole Arbitrator.

### F.  Post-Hearing Submissions

25. Each Party submitted its Post-Hearing Memorandum on December 9, 2022.

26. By email dated December 8, 2022, the Parties jointly confirmed that they did not consider
that there was any issue in respect to the Arbitrator's jurisdiction to award fees and costs.
Each Party submitted its fee and costs application on January 13, 2023.

## VI.    Facts of the Case

27. This section summarizes the facts the Arbitrator considers relevant to the determination of
the issues in this Arbitration.  Except where disputed facts are discussed below, the facts
recited in this section are substantially undisputed.  To the extent that there is any
disagreement as to the facts recited here that are not specifically identified as disputed, they
constitute findings of fact by the Arbitrator.  Further, the Sole Arbitrator's recitation of the
facts, as well as his evaluation of the respective claims and defenses of the Parties, has been
impacted by his assessment of the credibility of the witnesses who testified.

### A.  VTS and its Business

28. VTS is a Voice over Internet Protocol ("VoIP") telecommunications wholesale carrier that
was incorporated in 2014.[1]  Its business is to provide telecommunications services or
facilities to other telecom providers and internet service providers.  Typically, a call,
particularly an international call, is routed from a beginning point caller across several
carriers, each of whom provides equipment, bandwidth, and network capacity before
handing the call off to the next provider until eventually the call "terminates" at the endpoint
call recipient.  Each carrier in the chain finds the cheapest available routing to the next
carrier, taking into account, *inter alia*, available credit and payment terms.  Typical VoIP
international calls may be handled by as many as a dozen wholesale interconnect carriers.
Claimant VTS is one such wholesale interconnect carrier.  Because wholesale interconnect
carriers compete almost entirely based on pricing (including terms), which they guard as

---

[1] Although referred to here in the present tense, the evidence at hearing was that VTS has ceased operations.
TR-96.

confidential, each carrier in the chain typically knows the identity only of the counterparties it is dealing with directly.

29. As a wholesale interconnect carrier, VTS receives calls from its customers or "Buyers", routes the calls over its facilities, and hands the call off to the next carrier in the chain. It is undisputed that companies in the position of VTS have discretion to reject calls, route the call to any supplier in its discretion, and to terminate a call at any point in the routing process.

30. All times pertinent here, Mr. Arkady Sorokin was the Chief Executive Officer of VTS and owned 100% of the company. TR-121. Mr. Sorokin was introduced to the Tribunal as the "principal" of VTS. TR-3. Mr. Leonid Baranchuck was VTS' Financial Director.[2] It is undisputed that Mr. Sorokin and Mr. Baranchuck also co-owned and operated VTP, another VoIP telecommunications wholesale carrier that was incorporated in December 2018. TR-139 (VTP owned 50/50 by Messrs. Sorokin and Baranchuck). VTS and VTP provided services to at least three of the same Buyers during the period at issue in this arbitration, referred to herein as the "Overlapping Buyers".[3] VTS did not dispute that VTP was in the same or similar business as VTS, that it was owned and/or operated by Messrs. Sorokin and Baranchuck, and that the two companies shared the same headquarters address in Jenkintown, PA. RX-37 at 6.

31. Mr. Sorokin characterized VTS as a "boutique carrier" that focused on calls destined for a "very small handful" of countries that are not fully deregulated where VTS was able to obtain a better than market price or capacity that it could resell at a profit to other carriers. TR-96

32. VTS's services to each of its Buyers were governed by a reciprocal carrier services agreement ("RCSA") that set forth the rates charged for calls transmitted over its network.

---

[2] Mr. Baranchuck was also identified at times in the arbitration as a "principal" of VTS but the meaning and application of that term to Mr. Baranchuck remains unclear in the record. TR-121-22.

[3] The three Buyers were Red Phone Consulting, Wagner Telecommunications, and LDI Networks.

33. VTS leased operational and switching facilities and billing services from third party "switch provider" 46 Labs LLC.   46 Labs was responsible, among other things, for i) generating call detail records ("CDRs") that document the customer, rates, duration, and supplier for each call; and ii) invoicing VTS's Buyers.

34. Simple VoIP served as VTS's exclusive supplier of telecommunications capacity in respect to the transactions at issue here.

35. Voice Funding was a "funding partner" to VTS and named as a Loss Payee on the 2019 and 2020 Policies. TR-103; RX-11.  Voice Funding regularly lent money to VTS to bridge the cash flow gap between VTS's purchase of telecommunications capacity from other carriers and its receipt of cash from its own Buyers.

36. VTS contended that its pre-contractual due diligence regarding potential Buyers consisted of a review of financial records, confirmation where possible of state registrations and FCC Form 499 filings, and telephone interviews of the prospective Buyers.  R-4 at 18. VTS also maintained that it relied on NUFIC's "expertise in credit underwriting" as additional due diligence. *Id.;* Baranchuck Stmn't 22; cf.  TR-121 (Sorokin) (VTS relied on VF to do diligence on Buyers)

**B.  The 2019 Policy**

**The 2019 Policy Application Process**

37. In or about April 2019, VTS instructed its insurance broker Meridian International Insurance Services to obtain bids from additional carriers for the renewal of its trade credit insurance coverage that then was provided by Allied World Insurance.  One of the companies Meridian approached on behalf of VTS was AIG, the parent company of NUFIC.  In or about this period AIG advertised that:

> With more than 35 years of experience in trade credit, AIG offers unparalleled local underwriting and policy servicing capabilities.  Our non-cancelable limits coverage, credit management tools, and debt collection

services help our clients serve customers in more than 70+ countries with confidence.

38. VTS submitted an application dated May 3, 2019 to NUFIC, signed on behalf of VTS by Mr. Baranchuck, that contained the following representation:

> If a policy is issued, this application will be a material basis of the insurance. The applicant certifies that the representations made in this application are true to the best of its knowledge and belief, and that no material facts have been omitted.

39. The application stated the business of the Applicant as "Distributor" and its Products as "Telecommunication Whole Carrier."  The application referred to an "attached list" of "Largest Buyers".

40. AIG's Non-Binding Indication dated June 24, 2019 contained an Approved Buyer Limits list that showed approved limits for 7 Buyers, totaling $2,425,00 with several others listed with Buyer Limit Approved TBD".  R-9  It is undisputed that the Policy provided coverage only for VTS Buyers who were specifically named.  Although the evidence was that some trade credit insurance policies provide blanket coverage within limits for unspecified buyers, it was undisputed that the policies at issue here did not include any such "discretionary credit limit".   Statement of Claim ¶33; R-10 (Discretionary Credit Limit set at $0 with notation "Named Only")

41. The 2019 Non-Binding Indication also provided that prior to binding of coverage, VTS was to provide:

> Written confirmation… stating that it is unaware of any buyers to be included in the policy which are currently in financial difficulty[4]

---

[4] There was no evidence in the arbitration as to whether VTS supplied the information called for in this letter. Notably,  it appeared that the Overlapping Buyers were delinquent on VTP invoices at the inception of the 2019 Policy.  Meza Stmn't-I ¶51.

42. The 2019 policy, issued on July 16, 2019, provided $2 million in initial insured limits.  R-10. The 2019 and 2020 Policies both covered "Eligible Shipments" to named Buyers. Eligible Shipments were defined as

> …any and all shipment(s) of goods insured to the buyer pursuant to the contract of sale, provided that the goods insured are:
> 1. Shipped during the policy period. Shipment begins when the goods insured have left the custody and control of the insured or its agent in transit to the buyer;
> 2. Delivered as required under the contract of sale;
> 3. Sold for contract currency and in accordance with the maximum terms of payment; and
> 4. Shipped in conformity with the applicable export laws and regulations

43. The Insured's Warranties and Covenants in the 2019 Policy included the following:

> That the statements contained in the application and any attachments thereto, which are hereby part of the policy, are true and that no material information has been withheld. Furthermore, that the insured has no knowledge at policy inception of any circumstances that may reasonably be expected to result in a loss hereunder, except for that which is specifically disclosed about particular buyers in the application.  The insured warrants that all information given by the insured to the Company after the inception of the policy period will be true to the best of the insured's knowledge.

44. Further, the 2019 Policy provided that:

> This policy shall be cancelled and coverage denied in the case of intentional concealment, misrepresentation or non-disclosure, or fraud by any insured of a material fact concerning this insurance or the procurement thereof.  Also, this policy shall become void and all claims made and premium paid hereunder shall be forfeited, and all payments made by the Company shall be returned with interest thereon by the insured upon demand.

45. Voice Funding was named as a Loss Payee under an endorsement to the Policy.  However, AIG did not agree to VTS's request that Voice Funding be permitted to submit claims on its behalf.  Rather, the endorsement provided that all claims filed under the Policy would be adjusted with the insured VTS and that Voice Funding as Loss Payee would have no rights to pursue a claim directly against the carrier or assume any other rights under the Policy.

46.  VTS did not make any claims under the 2019 Policy.

### C.  The 2020 Policy

**The 2020 Policy Renewal Process**

47.  On May 13, 2020, VTS submitted an application to NUFIC to renew its trade credit insurance. R-14.  VTS answered "No" to Question 4.1, which read as follows:

> Are you aware of any material deterioration in the financial condition of any Buyer insured or of any circumstance that may reasonably be expected to result in a loss which the Company has not already been made aware of?

48. Mr. Sorokin signed the application, including an Attest by which "The Applicant warrants by the signing of this Application by an authorized officer:

> That, to the best of its knowledge, the statements set forth herein and any information or statements furnished hereafter are true, that no material information has been withheld…."

49.  Further, the application contained the following language above the signature line:

> The undersigned authorized officer of the corporation declares to the best of his/her knowledge that the statements set forth herein are true.
>
> NOTICE TO APPLICANTS:
> This application does not bind the Applicant or the Company, but it is agreed that this application will be the basis of the contract should a policy be issued, and it will be attached to and made a part of the policy.

50.  On June 22, 2020, AIG issued a Non-Binding Indication for the renewal insurance policy. RX-15.  The document stated that final terms and conditions would be quoted only after the carrier's review of any required documentation.   The items AIG requested prior to binding of coverage included the signed and completed application and "written confirmation from the applicant stating that it is unaware of any buyers to be included in the policy which are currently in financial difficulty."

51.  By letter dated June 26, 2020, RX-16, Mr. Sorokin instructed Meridian to bind the renewal coverage and stated:

This is written confirmation that we are unaware of any buyers to be included in the policy which are currently in financial difficulty.

52. The 2020 Policy dated July 6, 2020 provided $3.5 million of coverage in respect to Named Buyers only. RX-1. A schedule of Buyers and their respective credit limits was attached to the 2020 Policy. CPreHB at 9-11. There was no discretionary credit limit. The "Goods Insured" was stated as "Telecommunication Whole Carrier."

53. The 2020 Policy contained a series of exclusions, including for losses caused by or resulting from:

2. Wrongful or dishonest acts or omissions of the insured or its agents.

3. Any material breach of or inaccuracy regarding any warranty or representations made herein, or failure to perform or to fulfill any warranty, covenant or agreement made herein by the insured

54. Further, VTS as the Insured warranted and agreed:

That the statements contained in the application and any attachments thereto, which are hereby part of the policy, are true and that no material information has been withheld. Furthermore, that the insured has no knowledge at policy inception of any circumstances that may reasonably be expected to result in a loss hereunder, except for that which is specifically disclosed about particular buyers in the application. The insured warrants that all information given by the insured to the Company after the inception of the policy period will be true to the best of the insured's knowledge.

55. General Condition H of the 2020 Policy provided:

CONCEALMENT, MISREPRESENTATION, NON-DISCLOSURE, OR FRAUD:

This policy shall be cancelled and coverage denied in the case of intentional concealment, misrepresentation or non-disclosure, or fraud by any insured of a material fact concerning this insurance or the procurement thereof. Also, this policy shall become void and all claims made and premium paid hereunder shall be forfeited, and all payments made by the Company shall be returned with interest thereon by the **insured** upon demand.

56. Voice Funding was named as a Loss Payee under an endorsement to the Policy.

**D. VTS's Buyers and Business Operations**

57. There was substantial evidence in the arbitration regarding VTS's business operations, the identity and operations of its insured Buyers, and VTP's operations.   While the Parties sharply disagree as to the significance of this evidence in relation to VTS's insurance coverage with NUFIC, VTS did not substantially dispute the evidence.

**VTS's Operations in the 2019 Policy Period**

58. During the 2019 policy period, VTS made several requests to add named Buyers to the 2019 Policy.  Mr. Sorokin testified that Voice Funding's goal was for VTS to increase its coverage to $4.5 million through the process of adding Buyers with approved credit limits.  NUFIC approved some increases in VTS's insured limits during the 2019 Policy term.  TR-385.

59. Although the Parties do not agree as to the extent of VTS's knowledge regarding relationships among its Buyers, it is undisputed that one Buyer, LDI Networks Inc, referred all of the other Buyers to VTS.   Mr. Louis Arriola was reported as LDI's Chief Operating Officer in its 2017 annual report.  It was undisputed that Mr. Arriola pleaded guilty to criminal charges of executing a scheme to defraud telecommunications service providers in 2009 and has been a defendant in a number of civil lawsuits alleging financial and telecommunications-related fraud. R-19.  Teleescrow, Inc., described further below, was among the co-defendants sued with Mr. Arriola in several cases. [5]

60. NUFIC presented proof that at least some of VTS's Buyers were companies that had become inactive in their states of incorporation and were reactivated by persons who were not previously named as an officer, director, or owner of the company.[6]  NUFIC contended that each of these companies had been the victim of identity theft and were not legally authorized to incur charges with VTS.   VTS disclaimed knowledge in this arbitration as to whether or not the companies had been victims of identity theft.

---

[5] The Sole Arbitrator issued a third-party summons to Mr. Arriola at the request of Respondent.  Mr. Arriola did not comply with the summons and did not testify in the arbitration.

[6] These Buyers were Red Phone Consulting LLC, Wagner Telecommunications Inc., Telecom Capital Trading Partners LLP, Voister Telecom Inc, and Phone Works Inc.

61. In or about January 2020, VTS began using an online payment platform called Teleescrow to make and receive all payments.

**E. VTP and Blue Elephant**

62. As noted above, three of VTS' named Buyers also were Buyers with VTP.  These Buyers were referred to in the arbitration as the "Overlapping" or "Cross-Over" Buyers and are identified by name in the description of VTS and its business above. It was undisputed that as of June 2019, when NUFIC issued its Non-Binding Indication to VTS, each of the Overlapping Buyers had been in default for more than six months on more than in the aggregate $1 million in invoices they owed to VTP.  Meza Stmn't-I ¶¶51-56; RX-218 (Blue Elephant demands that VTP repurchase various invoices aged more than 120 days, totalling $1,378,300.)  Although the Parties disagreed as to the reason the Overlapping Buyers were in default to VTP, VTS's expert testified that the Overlapping Buyers had experienced "severe cash flow issues".  Warfel Stmn't-I at 9

63. VTS contended that the defaults of the Overlapping Buyers in their obligations to VTP arose from a "commercial dispute" in which VTP's factoring company Blue Elephant Finance "pulled their funding without notice" leaving the Overlapping Buyers in a "severe cash crunch". [7]  Warfel Stmn't-I ¶9; Sorokin Stmn't-II ¶34. Mr. Sorokin characterized the "commercial dispute" as the "buyers withheld payment to VTP so that they could hold on to the cash…." *Id.*  Further in regard to the situation VTS characterized as a commercial dispute that did not bear on the financial capability of the Overlapping Buyers, there was evidence that VTP advised Blue Elephant that the Buyers could not pay their invoices unless Blue Elephant paid VTP on the factored invoices so that VTP could purchase more telecommunications capacity. R-214.  Blue Elephant objected to the business practice

---

[7] The factoring arrangement was a Receivable Purchasing Agreement dated December 19, 2018 between VTP Communications, Inc. and Blue Elephant Financing, LLC.

implicit in VTP's statement on the basis that VTP should not be in a position where it required Blue Elephant's funding for the operation of its business.[8]

64. Mr. Sorokin testified that although the factoring arrangement was between Blue Elephant and VTS, to factor VTS's customer invoices,  its customers were adversely impacted by Blue Elephant's suspension of factoring because VTS then could not purchase telecommunications capacity and the customers in turn could not obtain such capacity from VTP to fulfill their obligations to other carriers.  TR-158 (Sorokin) (Blue Elephant action "detrimentally affected the business of the Overlapping Buyers); 173-80.

65. Blue Elephant expressed serious concerns regarding the financial performance and financial controls of the Overlapping Buyers and characterized the situation of the Buyers as "not just a customer late in payments" but as customers that were "well in default."  Meza-I ¶49; RX-214 (email dated May 14, 2019 from Blue Elephant COO Donald Barrick to Leonid Baranchuck re "need to discuss controls on the account" stating his "concerns" including that total net advances to VTP were then more than 20% over the established limit); RX-215 (email chain June 6-7, 2019 from Donald Barrick to Arkady Sorokin and Leonid Baranchuck at vtp.com, stating *inter alia,* "please stress with all three customers that we need payment and a plan early next week. To be honest, none of the three have made us feel any more comfortable at this point…. We really need response here. This isn't just one customer a little late on payments. All three are now well overdue.")

66. By email dated October 31, 2019, Blue Elephant advised VTP that it would not renew the factoring arrangement when it expired at the end of that year because "the appetite just isn't there." RX-219.

67. Although the Parties disagreed as to the reason Blue Elephant declined to factor the Overlapping Buyers' VTP invoices from approximately May 2019, it was undisputed that i)

---

[8] RX-214 "This is not good.  When we buy receivables, they are not to be contingent on any other action. …How can their payment be contingent on your buying more inventory.  That makes no sense."

Blue Elephant engaged in ongoing efforts to collect on outstanding invoices that it had factored; and ii) as of the time in 2020 when VTS applied to renew its trade credit policy with NUFIC, more than $1 million of the foregoing VTP invoices remained unpaid.  RX-220 (Blue Elephant outside counsel letter dated November 12, 2019 to VTP demanding repurchase of $2,041,929 in more than 90-days past due invoices for an agreed "buyout amount" of $1,343,543; Blue Elephant letter dated October 24, 2019 to Mr. Arkady Sorokin making same demands).

68. In August-October 2020, Blue Elephant sued Red Phone, Wagner, and LDI in New York Supreme Court, Queens County, as assignee of VTP pursuant to a Receivables Purchase Agreement dated December 19, 2018.  Blue Elephant sought to collect $744, 751 from LDI; $635,034 from Wagner and $355,746 from Red Phone, in each case on invoices dating to May 2019. RX-33.

**F.  Other Receivables Transactions and Collections Action**

69. In or about March 2021, some four months after VTS submitted its claims under the 2020 Policy to NUFIC, LDI and Mr. Arriola issued a promissory note in favor of VF, the "funding partner" of VTP and VTS. RX-225. Schedule A to that promissory note listed the ten outstanding invoices of VTS to all of the Claimed Buyers, with a total outstanding of $3,948,204, that were the subject of VTS's claim to NUFIC.  The note was payable in full on December 31, 2021, with specified discounts for earlier payment.

70. On February 8, 2022, LDI issued an amended promissory note to Voice Funding with a principal amount of approximately $3.8 million and a final repayment date of December 31, 2022.

71. From in or about March 2022, Voice Funding pursued collection actions against LDI and Mr. Arriola under the promissory notes.  In a demand letter dated March 12, 2022, Voice Funding's outside counsel stated that:

> When Voice Tele Services Inc. ("VTS") filed a claim on this [the 2020 NUFIC] policy, AIG launched an investigation where a number of alarming irregularities came to light questioning the legality of your and LDI's arrangements.  Also, AIG's

21

findings triggered Voice Funding to conduct its own investigation and its findings parallel some of AIG's findings.  R-236

72.  In or about April 2022, Voice Funding filed a breach of contract case against LDI and Mr. Arriola in New York State Supreme Court, claiming $3,846,253 under the amended promissory note described above.  R-235.   Voice Funding's Memorandum of Law in Support of Summary Judgment in Lieu of Complaint alleged that "LDI, a telecommunications provider, owed an outstanding balance it committed to pay by entering into a promissory note, backed by LDI's principal, Arriola…."

73.  In court papers in evidence in this arbitration, Voice Funding alleged that LDI and Mr. Arriola failed to make payments under the amended promissory note.

**G.  Possible Identity Theft**

74.  NUFIC submitted evidence that VTS's Claimed Buyers (those as to which VTS filed a claim under the 2020 Policy), with the exception of LDI, had been the victims of "identity theft". NUFIC's investigator attempted to contact each "Original Principal" of the Claimed Buyers.[9]  The investigator was successful in reaching five Original Principals, each of whom stated that i) the entities had been inactive and apparently had been reinstated without the knowledge or authorization of the Original Principal; ii) the "original, authorized corporate entity" had never transacted with VTS; and iii) financial statements of the entities that VTS provided to NUFIC's underwriters did not reflect actual commercial activity by that original, authorized entity.  RPreHB 9-10.  NUFIC contended that although the original entities had become dormant, the Original Principals had not relinquished authority over the entities, so that the unknown persons who reinstated the entities and held themselves out as authorized to act for them had fraudulently assumed the corporate identity of the original entities. *Id.*

---

[9] NUFIC used the term "Original Principal" to mean the principals of the companies before they were reinstated by third parties who had no previous involvement.  TR-492.

**F. VTS's Insurance Claim**

75.  In or around November 2020, VTS through its broker Meridian submitted Proof of Loss forms to NUFIC for claims it described in this arbitration as arising from the substantially simultaneous defaults of the ten Claimed Buyers, aggregating $4,013,204.76.  CWS-1 ¶45; RWS-Meza ¶12.  VTS later withdrew its claims for three of the Claimed Buyers as to whom VTS had earlier terminated its Reciprocal Carrier Agreements, with the result that the indemnity claims here aggregate $2,559,057.48.[10]  VTS stated that its submission of the Proof of Loss claims followed its own unsuccessful collection efforts, that at least some of the Claimed Buyers had reliable past payment records with VTS, and some had made promises to pay before VTS determined they were in default.

76.  AIG sent an initial information request letter dated December 11, 2020 to Meridian.  C-60.  Among other things, AIG noted that nine of the initially ten claimed Buyers were 30 days past due on VTS invoices as of July 1, 2020, the first day of the 2020 Policy Period, and that all ten of the Buyers had defaulted on the first and only invoice issued by VTS during the 2020 Policy Period. CX-60; RWS-Meza ¶15.  AIG also requested information regarding VTS's services and rates under its Reciprocal Carrier Services Agreements, the reasons why VTS had terminated its Services Agreements with three of the Buyers, VTS's comments on why the Buyers had simultaneously slowed their payments to VTS and then paid their past due balances within the same time frame,  the role of Teleescrow as to six of the Buyers and in the industry, and the network infrastructure that provided the platform for capacity VTS sold.

77.  VTS responded to AIG's December 11 letter on December 18, 2020.  VTS noted that it had had existing and ongoing relationships with the defaulting Claimed Buyers prior to the 2020 Policy period and that all of the Claimed Buyers were covered also by the 2019 Policy.  VTS addressed the timing of all ten of its Claimed Buyers "going delinquent around the same time" as possibly the result of "some carrier has run into problems".  VTS identified as possible problems affecting carriers in the chain as i) a Canada Revenue Agency audit of

---

[10] VTS withdrew its claims as to Red Phone Consulting, Wagner Telecommunications, and Telecom Capital Trading Partners.  Meza Stmn't-I ¶12

Iristel, a large Canada wireless provider, that may have resulted in Iristel being unable to pay its vendors because its funds were held up in the audit process; and ii) the possibility that LDI was in a dispute with its "funding partner" resulting from its "factoring line being pulled".

78. VTS stated that its reason for terminating its Services Agreements with three Claimed Buyers was that its funding partner Voice Funding had notified VTS of its intent to reduce VTS's available line of credit and had identified the three Claimed Buyers as ones VTS should terminate.  VTS noted that it interconnected with Simple Voip LLC as a provider of international wholesale voice capacity that provided VTS with capacity to terminate calls to Zambia. VTS identified 46 Labs as its third-party switching service provider that provided infrastructure to take incoming calls from VTS's Buyers and route the calls to VTS's suppliers, keep track of all Call Detail Records and provide automated invoice generation based on the actual traffic run through the switch that VTS leased from 46 Labs for each invoicing period. R-18.

79.  By letter dated January 11, 2021, to Meridian, AIG stated that in light of the scope and volume of the Claimed Buyer defaults, the near-simultaneous timing of the defaults, and the "corporate histories of many of the Claimed Buyers", NUIFC was evaluating the Claimed Buyers "within the broader context of the Voice over Internet Protocol (VoIP) industry". The letter set out "additional comments, questions, and requests for additional information and clarification", including:

- o  AIG stated that it was unable to conclude whether the transactions VTS was claiming constituted "Eligible Shipments conducted pursuant to a requisite Contract of Sale" within the meaning of the 2020 Policy.   AIG stated its understanding that VTS engaged Simple Voip LLC to provide the "necessary voice capacity" and that 46Labs provided the "infrastructure" to take incoming calls from VTS's Buyers and then route the calls onward.

- o  The physical networks VTS and its Buyers accessed to transport long-distance minutes and the point at which VTS acquired "custody/control" of the long-distance minutes being terminated;

- o The reason Phone Works had made an inquiry to VTS about getting its invoices "financed";
- o Documentation of i) the credit limit VTS had approved for each Claimed Buyer; ii) communications or other documents confirming what the Claimed Buyers had ordered "in terms of minutes quantity and destinations"; and the timing and mechanics of VTS's call capacity and route negotiation process with the Claimed Buyers;
- o In the absence of Call Detail Records, which AIG understood were not preserved for the claimed transactions, how VTS would verify any discrepancies regarding "traffic ran and invoiced" and to verify that it supplied, and the Buyers received, the minutes purchased;
- o Noting evidence of changes in the corporate status of "many of" the Claimed Buyers, the possibility that at least two of the Claimed Buyers were "victims of identity theft" and that LDI had been flagged by Dun & Bradstreet as "high risk", information regarding the "downstream suppliers" VTS had identified as affected by a large carrier's potential cash flow problems and the manner in which such issues could have affected the liquidity or cash flow of the Claimed Buyers;
- o Facts and circumstances related to VTS's initial introduction to the Claimed Buyers, including any third party references or direct telephonic vetting conducted by VTS, whether six of the Claimed Buyers were referred by the same party at the same time and whether VTS was aware of any relationship between such Buyers;
- o Details regarding VTS's pre-contractual due diligence of the Claimed Buyers and its post-sale collection efforts, including whether VTS verified that the Claimed Buyers and its vendors were duly licensed and registered and whether it screened any geographic regions or "downstream carriers" that were known to be susceptible to fraud;
- o The origin and nature of Teleescrow's role in the claimed transactions and within the industry generally;
- o The role of Voice Funding in the claimed transactions and the reasons it sought to reduce credit lines and terminate activity for three of the Claimed Buyers in July 2020;

25

o   Information regarding LDI's "particular issues" might have directly or indirectly resulted in the other nine Claimed Buyers' defaults and whether VTS had any concerns that LDI was a "paper company" that had engaged in transactions that "lack[ed] commercial reality."

80.  It was undisputed that virtually all of the call volume of VTS's Buyers supporting the invoices giving rise to its claims arose from calls terminating in Zambia.  NUFIC presented evidence that the alleged call volume to Zambia supporting the invoices for a nine-day period in 2020 substantially exceeded the total published reported call volume to that country for all of 2020. VTS contended that the reported call volume represented only call traffic data collected by regulators and self-reported by network operators.  Mr. Sorokin testified that VTS's Buyers' call volume to Zambia included in addition "toll bypass, local gateways, or Value Added Services" providers, which he described as alternative arrangements for the routing of long-distance traffic.  Sorokin Stmn't-II ¶5.  NUFIC characterized these arrangements, to the extent they existed, as fraudulent unauthorized insertion of traffic into another carrier's network to make international calls appear to be cheaper domestic calls.  TR-562-63.

81.  VTS responded to AIG's January 11 letter on February 2, 2021.  Among other things, VTS advised AIG that:

o   VTS "leases/controls" network infrastructure from 46Labs to transmit international wholesale calls.  VTS's functionality is to perform authentication, authorization, and accounting functions and to transmit the call through its network to the downstream supplier.

o   A CDR containing the customer, rates, duration, supplier, and other information is generated for every call and serves as a transactional record of a call being delivered from a customer to the supplier.

o   VTS received calls from its Buyers without any knowledge of the networks from which the calls originated.

o   VTS had custody of long-distance calls from the moment the call is authorized to enter the VTS network and continuing only so long as the call was on its network.

Simple Voip was VTS's exclusive capacity supplier for each of the claimed transactions.

o   VTS did not provide "invoice financing"; VTS offered termination capacity at a good rate and paid suppliers as often as daily, while extending 30-day credit terms to Buyers VTS had insured.

o   VTS relied on its trade credit insurance carrier to "underwrite the credit limit" for each Buyer.

o   The Claimed Buyers "contract" with VTS  was for VTS to deliver calls to the destination at the prevailing rates published by VTS on a call-by-call basis by sending phone calls to its network.

o   VTS's business was "supply oriented" such that it focused on the attractiveness of rates it offered to its Buyers and resold the capacity that was offered to it, rather than trying to purchase what customers might need; VTS's purchases and sales were done in real time in that it would send traffic incoming from its Buyers to its supplier Simple VoIP.   With third party switch providers hosting its infrastructure, and transactions with its Buyers and the supplier occurring in real time, VTS was able to scale its capacity very quickly and efficiently without incurring excess capacity.

o   VTS's practice was for 46Labs to preserve CDRs for 90 days and delete the CDRs if no dispute was filed by the buyer in that period; when a dispute was filed, VTS would download the relevant CDRs and preserve them until resolution.

o   VTS had a strong relationship with LDI going back to 2016 and relied on its extensive relationships and recommendations to source Buyers; VTS had its own relationship with four of the Claimed Buyers, including LDI, prior to the inception of the 2019 Policy.

o   LDI had repeatedly advised VTS that it was being affected by the Canadian Revenue Agency freezing of Iristel's funds; VTS considered it possible that LDI was both a supplier and customer to Iristel.

o   Further, VTS understood that LDI's credit lines had been withdrawn by its lenders.

o   Notwithstanding its information regarding LDI's financial difficulties, VTS had "zero concerns" that LDI was a "paper company" or "lacks commercial reality".

o   VTS had no information regarding potential identity theft relating to the Claimed Buyers or its claims under the 2020 Policy; identity theft seemed "counter-intuitive"

27

since the carriers RedPhone and Wagner had been making consistent and timely payments to VTS for more than two years and only defaulted as what appeared to be a "broader event" affecting a number of different Buyers.

o   VTS believed that some or all of the Claimed Buyers other than LDI also had some "exposure" to Iristel that affected their ability to pay VTS.

o   VTS was introduced to Teleescrow as a third-party escrow service platform in 2020; since VTS's vendors and customers both accepted payments on the platform, VTS considered that its exposure to the system was "minimal" and agreed to move all transactions to the platform at the request of its customers.

o   As VTS's lender with a security interest in its invoices, Voice Funding's determination to reduce credit lines and terminate activity for three carriers was based on its determination to raise cash for potential investor redemptions.

82.  By letter dated February 19, 2021, AIG advised VTS that it was "unable to conclude that VTS's ten claims submitted under Policy No. 16483374-20… are covered under the Policy." Noting that under the 2020 Policy the Insured bore the burden of proving a loss and providing evidence that all conditional and representations have been complied with, AIG stated that it had concluded that the claimed transactions i) Did not constitute "Eligible Shipments" within the meaning of the 2020 Policy; and ii) were not conducted pursuant to a requisite "Contract of Sale."

83.  AIG predicated its conclusion on its understanding that i) VTS did not own or control the availability or transmission of call traffic on an existing physical network, but, rather, leased or controlled network infrastructure from 46Labs; ii) VTS did not have "custody and control" of "Goods" that were "shipped" to a covered Buyer under the 2020 Policy and instead of the "requisite purchase and sale arrangement contemplated under the Policy, "VTS's business model resembles a services arrangement…."; and iii) the absence of written purchase orders and shipping documents representing the transfer of custody and control of Goods Insured to VTS's Buyers failed to establish the 2020 Policy requirement that the Goods Insured were delivered pursuant to a Contract of Sale.

84. Although AIG did not directly predicate its initial denial of coverage on its ongoing investigation of the Claimed Buyers, it noted that the investigation had raised "significant questions as to whether the invoices claimed reflect "valid and legally enforceable obligations of the buyer" within the meaning of the 2020 Policy, including "serious concerns about the legitimacy of VTS's nine Buyers in addition to LDI, as to which AIG had a separate set of concerns.  AIG noted that among its concerns were i) LDI had referred each of the other nine defaulted Claimed Buyers to VTS; ii) LDI may have served as an "upstream customer" in the other Claimed Buyers' supply chains such that liquidity issues affecting LDI would necessarily affect each of VTS's Claimed Buyers simultaneously; iii) NUFIC's investigation into LDI and its principal Louis Arriola had uncovered numerous corporate and operational irregularities,  Mr. Arriola's history of fraud and litigation, and links between LDI and Mr. Arriola with Teleescrow as a business partner in other ventures that cast doubt in AIG's view on the legitimacy of Teleescrow as a neutral third-party escrow service platform. Further, in response to VTS's statement that it relied on NUFIC's credit underwriting for the claimed Buyers, AIG stated that NUFIC's underwriting evaluation was "for NUFIC's benefit in assessing appropriate buyer limits under the Policy" and that such underwriting did not supersede VTS's own due diligence and disclosure obligations.  AIG also noted that VTS had not disclosed that there was a high concentration of exposure among the Claimed Buyers that could lead to a simultaneous default scenario, nor the fact that each of the Claimed Buyers was sourced from LDI.

85.  Thereafter, the Parties continued their discussion of the claims through a series of letters between outside counsel.  By letter dated March 17, 2021, VTS's counsel asserted that AIG's position that VTS's business might not constitute "goods insured" under the 2020 Policy, taken to its logical extreme, would result in AIG not actually covering any VTS credit claim, rendering its coverage illusory.   Counsel noted that VTS was properly identified in the credit insurance policy application as a wholesale telecommunications provider and that the Policy included a Buyer Schedule that identified the ten Buyers on which VTS had submitted claims.  As such, AIG was on notice of VTS's business and had a full and fair opportunity to perform a proper underwriting analysis prior to issuance of the Policy.   Counsel also disputed AIG's prior contentions regarding the Policy's requirements concerning the

Insured's "custody or control over the 'goods insured'".  Further, counsel stated that VTS had no prior knowledge that any of the ten Claimed Buyers presented anything other than a standard credit risk, including any knowledge that the Claimed Buyers presented a concentrated credit risk, and noted that AIG's underwriting process had not uncovered the potential credit risks on which it was relying.

86. NUFIC's outside counsel responded by letter dated March 30, 2021, in which it reiterated AIG's earlier arguments regarding the Policy's Eligible Shipments and Contract of Sale requirements and contended that VTS had failed to address "serious corporate irregularities and inconsistencies relating to VTS's buyers and related parties…."  Counsel identified as concerns i) VTS's "previously undisclosed reliance" on LDI Network and its principal Louis Arriola; ii) connections of LDI and Mr. Arriola to Teleescrow; iii) the reinstatement of the corporate entities of the majority of the other nine Claimed Buyers after a period of inactivity and/or the registration of "duplicate" corporate entities with similar names and overlapping principals; and iv)allegations by at least two of the Claimed Buyers that they had been the victims of corporate identity theft.  Counsel contended that VTS was responsible to ensure that it was extending credit to and conducting arms-length transactions with legitimate companies engaged in non-fraudulent activities and disclaimed any responsibility of the NUFIC underwriting process to establish such facts.  Counsel also stated that NUFIC had received written acknowledgements from at least three of the Claimed Buyers that they never transacted with VTS and had no knowledge of the claimed invoices.   Further, counsel noted that NUFIC recently had learned that i) Claimed Buyer RedPhone was the subject of collection efforts for delinquent invoices that VTP had assigned to factoring finance company Blue Elephant; ii) VTP was owned and/or operated by the same principals as VTS, was in the same business, and shared the same headquarters address; and iii) Blue Elephant had sued RedPhone in New York State Supreme Court, Queens County in 2020 for May 2019 unpaid VTP invoices.

87. By letter dated May 5, 2021, VTS's counsel reiterated its argument that NUFIC's position in regard to Eligible Shipments would result in the Policy never providing coverage to any aspect of VTS's business.  Further,  counsel stated that the NUFIC application that VTS

completed nowhere asked VTS to identify the source of its customers, any escrow companies that might be utilized in its business, or to provide any information regarding its owners or other business endeavors they might be involved with.   VTS's evaluation of the Claimed Buyers, including LDI, did not raise any red flags and the payment histories of several Claimed Buyers did not raise any concerns.

88. By letter dated May 20, 20121, NUFIC's counsel provided "NUFIC's formal decision to deny coverage" and to provide notice that based on VTS's "concealment, misrepresentation, and non-disclosure of material facts", the Policy and the claims were void and all premiums paid by VTS forfeited.   In addition to reiterating prior arguments, NUFIC's counsel recited a number of "critical facts" it contended were undisputed.   These included that i) nine of VTS's ten Buyers were referred to VTS by LDI and Louis Arriola; ii) Arriola and LDI were connected to Teleescrow; iii) a majority of the Claimed Buyers were either reinstated after a period of commercial inactivity and/or have duplicate corporate entities registered with similar names and overlapping principals; and iv) each of the five Claimed Buyers NUFIC established contact with confirmed that it had been the victim of identity theft and disclaimed any debt to VTS.   Counsel disputed that NUFIC's application did not call for disclosure of any of the information on which it relied, noting that the application had required VTS to warrant that no material information had been withheld, it had no knowledge of any circumstances that may be expected to result in a loss, and that it would use all measures to prevent and minimize loss.   Further, counsel contended that VTS's claimed traffic volume of approximately 9.9 million minutes of calls terminating in Zambia billed to VTS's ten Buyers between July 1 and 9, 2020 was "implausible" in that based on published data the total billed U.S. to Zambia traffic in 2020 unlikely exceeded five million minutes.

## VII.   Issues to Be Determined

89. After carefully considering the Parties' submissions and the evidence, the Arbitrator considers that determination of the following issues is sufficient to resolve the claims and defenses in this arbitration:

**Issue 1**

**Did VTS intentionally conceal or misrepresent facts from NUFIC during the 2020 Policy application process?**

**Issue 2**

**Did NUFIC fulfill any duties it may have had to VTS in NUFIC's underwriting of the 2020 Policy?**

90. For the reasons discussed below, I conclude that I need not reach the following issues that the Parties raised in this arbitration in order to fully resolve the claims and defenses in this arbitration:

- Were the transactions for which VTS seeks insurance coverage "valid and legally enforceable" obligations within the meaning of the 2020 Policy of the Claimed Buyers?

- Were the transactions for which VTS seeks coverage conducted "pursuant to a contract of sale" within the meaning of the Policy?

- Did VTS prevent or minimize its losses to the extent required by the Policy?

- Did the transactions for which VTS seeks coverage constitute "eligible shipments" within the meaning of the Policy?

## VIII.    Discussion

### A.  Issue 1: Did VTS intentionally conceal or misrepresent facts from NUFIC during the 2020 Policy application process?

#### 1)  Parties' Positions

**VTS**

91. New York law construes insurance contracts in favor of the insured and resolves all ambiguities against the insurer.

92. VTS focuses in this arbitration on the various duties by and between the Parties. CPostHB1. VTS did not have a duty to generally share information that might have been relevant to NUFIC's underwriter.  *Id.*   An applicant for insurance is required to disclose only

information that is called for by a question on the insurance application. *Id.* The question must be so "plain and intelligible that any applicant can readily understand it. If any ambiguity exists, the construction will obtain most favorable to the insured." CPostHB 12, citing *Dineen v. General Accident Ins. Co. of Phila.*, 126 A.D. 167, 169 (4th Dep't 1908). The applicant is under no duty to volunteer information. *Vella v. Equitable Life Assur. Soc. of U.S.*, 887 F.2d 388 (2d Cir. 1989) ("no duty to volunteer information where no question plainly and directly requires it to be furnished…."); TR-443-44 (Warfel) ("They have to be prompted.")

93. VTS was under no duty to disclose anything related to VTP because no question in either the initial application or the renewal application asked about businesses other than VTS, including any other businesses the shareholders of VTS may have been involved with. CPostHB 13-14.

94. VTS had no obligation to disclose financial issues relating to the Overlapping Buyers based on events involving those Buyers, VTP, and VTP's factoring company, Blue Elephant in response to Question 4.1 on the Renewal Application, which inquired whether the applicant was "aware of any material deterioration in the financial condition of any Buyer insured or of any circumstance that may reasonably be expect to result in a loss which the Company has not already been made aware of".

95. The foregoing question was ambiguous because it did not provide any guidance as to what a "material deterioration in the financial condition" means, including any metric by which to measure materiality. As such, VTS's responses on the application was accurate. CPostHB 2. Further, in respect to the payment dispute involving VTP, the Claimed Buyers' failure to pay Blue Elephant arose out of a "commercial dispute" in which Blue Elephant summarily stopped factoring the Claimed Buyers' invoices. The dispute was not an indication that the Claimed Buyers had experienced a material deterioration of their financial condition, but rather a "common litigation tactic" of withholding money to leverage a resolution. CPostHB 15-16.

96. Under New York law, an insurer is entitled to rescind a policy upon misrepresentations in the application process only where the misrepresentations were material to the risk it was being asked to insure. A misrepresentation is not material unless knowledge by the insurer of the facts misrepresented would have led to a refusal by the insurer to issue the policy. CPostHB 11.  The materiality determination is generally based on the insurer's underwriting manual or testimony of the underwriter.  NUFIC did not present either such form of proof and has not carried its burden of demonstrating materiality.  *Id. at 2.*

**NUFIC**

97. Article VI.H of the Policy established VTS's contractual obligation not to conceal, misrepresent, or fail to disclose "any material fact" concerning the insurance of the procurement thereof.

98. The evidence did not support VTS's characterization of VTP as "a different company, different business model, different circumstances."  Rather, the record showed that VTS's two principals incorporated VTP in 2018 and operated VTP in parallel with VTS.  VTP provided the same type of wholesale VoIP telecommunications as VTS.  In April-May 2019, VTP was providing such services to the Overlapping Buyers who were in serious default to VTP at the time of VTS's initial policy application to NUFIC.  Those buyers were in default on over $1 million in invoices to VTP for wholesale VoIP services to Zambia.  VTS's principals were fully aware of the Overlapping Buyers' defaults and did not, directly or through its broker, disclose to NUFIC the parallel transactions or the Overlapping Buyers' defaults with VTP.  RPostHB 3-4.

99. The record did not support VTS's contention that the Overlapping Buyers defaulted in their obligations to VTP only because of a "commercial dispute" with Blue Elephant.  Rather, the evidence established that the Overlapping Buyers were in financial difficulty and Blue Elephant ceased factoring their invoices because it rejected their convoluted excuses.  *Id.* at 4-5.

100.  Multiple Policy provisions, the insurance applications, established industry standards, and New York law each imposed a duty of VTS to disclose completely and truthfully any known material facts regarding its coverage. *Id.* at 5-6.

101.  Further, VTS did not prove its contention that the Overlapping Buyers were paying VTS contemporaneously with their dispute with VTP.

102.  The information that VTS failed to disclose would have materially affected NUFIC's underwriting and the terms of the Policy.    Mr. Sorokin conceded that Blue Elephants' refusal to factor invoices for the Overlapping Buyers detrimentally affected their businesses, which was itself a "material fact" that VTS was prohibited from concealing or misrepresenting under Article VI.H of the Policy.

103.  NUFIC had no duty to ask questions on its application that would "prompt" disclosure of material information that was at the "core of the risk" that NUFIC was being asked to underwrite.  Moreover, even if VTS's disclosure obligation were limited to what NUFIC expressly solicited in the insurance applications, VTS violated its obligations by affirmatively and repeatedly misrepresenting the financial condition of the Overlapping Buyers in response to specific questions in the application and associated NUFIC pre-Policy correspondence. These misrepresentations included VTS's responses to question 4.1 on the application inquiring whether VTS was aware of any material deterioration in the financial condition of any Buyer insured or of any circumstance that may reasonably be expected to result in a loss, as well as the letters VTS was required to provide.   See RX-9 at 6, RX-15 at 6, RX-16, RPostHB 8.

104.  Under New York law, VTS misrepresentations were material as a matter of law because NUFIC would not have issued the same policy if it had been aware of the information that had been withheld.  RPostHB fn. 45.

**2)  Discussion**

**Issue 1**

105.  I find that during the policy renewal process in 2020, VTS failed to provide NUFIC with information expressly called for in that process, including on the renewal application. I find that these omissions violated express attestation, warranties, and covenants provisions that appeared on the face of, or were called for, by the application, the Policy itself, and related documents.

106.  Further, I find that VTS made material misrepresentations to NUFIC during the renewal policy application process, including on the renewal application and in VTS's letter response to NUFIC's inquiries contained in its Non-Binding Indication.  Details of VTS's omissions and misrepresentations are discussed below.

107.  I note at the outset of the analysis, that the omissions and misrepresentations on which my decision is predicated are those VTS made in response to specific questions on its application for the 2020 Policy, in response to the representation called for by NUFIC's Non-Binding Indication, and by the express policyholder warranties contained in the 2020 Policy only to the extent the 2020 Policy warranties referred to the foregoing application and Non-Binding Indication Letter questions.  I need not reach NUFIC's contention that an applicant for insurance is required to disclose all information that is material and relevant to the underwriting decision, whether or not it is expressly "prompted" by a question on the application, and I do not rely on any such broad disclosure obligation.[11]  See RPostHB 6, TR-320-23, 327 (Meza); TR-44 (NUFIC opening statement) (Article VI.H of the 2020 Policy in and of itself creates a disclosure obligation).

---

[11] Notably, VTS's expert William Warfel testified that a policy applicant would have disclosure obligations as to information that "...goes to the core or the risk that's being insured against – in this case, the financial impairment of a buyer" even if the applicant was not "prompted with a question that gives them a reasonable opportunity to be forthcoming and truthful about the nature of their business."  TR-475; RPostHB 7.  See also TR-450 ("...only in the event that the policyholder has direct knowledge, before the policy is renewed or before the policy is issued, to the effect that a buyer that's identified in the declarations is clearly in a financially precarious position and is at substantial risk not to be able to fulfill the terms of an invoice. That is an exception to the general rule that there need to be a question prompting a response....")  I find that in this case, VTS's omissions and misrepresentations to NUFIC concerned the financial impairment of at least the Overlapping Buyers and went to the core of the trade credit risk for which VTS was seeking insurance.

a. **VTS's Material Omissions in the 2020 Policy Application Process**

108.  I find that VTS had knowledge at the time of the renewal process, but failed to disclose, that since the inception of its original credit insurance policy with NUFIC there had been a material deterioration in the financial condition of at least the three Overlapping Buyers, who were among those for which VTS sought renewal credit insurance coverage. Specifically, I find that VTS was aware of the continuing defaults of the Overlapping Buyers on VTP invoices,  the continuing aging of those unpaid invoices, and as Blue Elephant's ongoing collection efforts.

109.  I do not accept VTS's contention that it was under no obligation to disclose any information regarding the business of VTP, including the financial performance of the Overlapping Buyers, in their VTP dealings.  Although it is true, as VTS argues, that no question in the application directly sought information regarding VTP or any company other than VTS, I find that argument to be collateral to the issue before the Tribunal.  While question 4.1 did not directly seek information regarding VTP or its buyers, I find that the question clearly and unambiguously sought information regarding VTS's "awareness" of a material deterioration in the financial circumstances of any of VTS's Buyers.  VTS has provided no authority to support that NUFIC was not entitled to inquire as to VTS's "awareness" of facts and circumstances that were directly relevant to the underwriting decision, nor does it provide any authority that would limit the basis on which a policy applicant may become aware of material information.

110.  I find the fact that VTP was separately incorporated is not relevant to my determination that VTS's key officers were aware, through their work with VTP, of a material deterioration in the financial condition of the Overlapping Buyers.  It is not necessary to my conclusions to determine the extent to which VTS and VTP were operated separately. On the record here, I find that VTS as a company clearly had become "aware" though the direct knowledge of Messrs. Sorokin and Baranchuck,  acquired in their management of VTP,  that at least some of the Buyers whose trade credit VTS was seeking to insure were or had been in serious default to VTP, a company under common control with VTS, in the same business

37

as VTS, and also operated by Messrs Sorokin and Baranchuck.[12]  I find on this basis that VTS was "aware" of a material deterioration in the financial condition of the Overlapping Buyers.

111.  I find that VTS's knowledge regarding the Overlapping Buyers also constituted "circumstances that might reasonably be expected to result in a loss under the Policy". VTS was aware at the time it applied for the 2020 Policy that i) the Overlapping Buyers had more than $1 million in VTP invoices outstanding for more than a year; ii) VTP's factoring company Blue Elephant had pursued collection correspondence against these Buyers; iii) Blue Elephant had demanded that VTP repurchase, as required under the terms of the factoring arrangement, long overdue VTP invoices to the Overlapping Buyers; and iv) Blue Elephant had advised VTP that it would not renew its factoring arrangement when it expired at the end of 2019.[13]  Mr. Sorokin testified that VTS's position with its factoring company had a direct impact on the fortunes of its Buyers.  I find that the foregoing facts, relating to both VTP itself and the Overlapping Buyers,  in the aggregate constituted circumstances that might reasonably be expected to result in a loss under VTS's 2020 Policy.

112.  I am mindful that the Overlapping Buyers were not in default in their obligations to VTS at the time of its application for the 2020 Policy, or at least not significantly so.[14]  VTS was required, however, to disclose a "reasonable expectation" of a potential loss under the Policy, not just the certainty of a loss.   I find that the facts regarding the Overlapping Buyers' serious defaults with VTP and Blue Elephant's collection efforts directed at these buyers and directly at VTP, at least in the aggregate, created a reasonable expectation that the Overlapping Buyers would default in their obligations to VTS as they had to VTP, thereby

---

[12] Notably, Mr. Sorokin testified that he was "aware" that LDI, Red Phone, and Wagner were in a dispute with Blue Elephant.  TR-155.

[13] I find that a communication from VTP's factoring company Blue Elephant provides some further evidence that Messrs. Sorokin and Baranchuck had knowledge of the operations of both VTS and VTP.  See RX-216 (urging Mr. Sorokin to "[p ull it from your other company" to pay VTP's outstanding invoices.)

[14] Although Mr. Sorokin testified that the Overlapping Buyers were making timely payments to VTS, VTS did not introduce any documentary evidence to support this testimony. TR-259.

resulting in a loss under the Policy that VTS was applying for.  Of course, such a loss did occur shortly after the inception of the 2020 Policy.

113.   I also find that question 4.1 was clear and intelligible in respect to the information regarding VTS's awareness that it sought to elicit.  I conclude that the terms "deterioration in the financial condition of a buyer" and "circumstances that might reasonably be expected to result in a loss" are readily understandable to an experienced businessperson.

114.  I find in particular that the foregoing terms were intelligible and clear to persons of the business sophistication level of Messrs. Sorokin and Baranchuck, who concededly were experienced business executives, and who, at the time were operating at least two complex, regulated telecommunications businesses.  See generally CX-62 (VTS letter to AIG dated February 2, 2021).  VTS's business model, and those of other VoIP wholesale carriers who were its Buyers, depended heavily on credit terms, the ability to implement back-to-back telecommunications capacity purchase and sale transactions on a very short turnaround time,  pricing and financial modeling. CX-62; TR-99

115.   I do not accept VTS's contention that question 4.1 was "ambiguous" because it did not provide a definition of the term "deterioration in the financial condition of any buyer" or a "metric" to determine whether such a deterioration was material.  While I consider question 4.1 to be clear and intelligible on its face, I also find that the term "deterioration in financial condition" should have been particularly clear to VTS, and the relevance of the information the question sought to elicit likewise clear, in the business context in which VTS sought trade credit insurance.  VTS's business was highly time-sensitive and highly price-sensitive. TR-99-100 (VTS operates in markets where it can obtain a price advantage or more capacity than the market so that it can resell the capacity to other carriers.); TR-158-62 (VTS's supplier payment terms are shorter than its customer payment terms.)  It was a relatively small wholesale telecommunications wholesale carrier that serviced other relatively small carriers in the same business, and it sought trade credit insurance as to a small number of buyers with relatively small credit limits.  Further, VTS was aware that LDI, the Overlapping Buyer that had referred to VTS all of the other Claimed Buyers whose credit sought to insure, was itself one of the Overlapping Buyers who was in default to VTP.

116.  I also find that VTS failed to prove its contention that the Overlapping Buyers' dispute with Blue Elephant was a "commercial dispute" that did not evidence a material deterioration in the financial condition of these buyers or circumstances that might reasonably be expected to result in a loss.  I find, rather, that there was substantial evidence in the record that Blue Elephant was seriously concerned with the financial performance and financial condition of the Overlapping Buyers.  This evidence includes emails in which Blue Elephant's officer advised VTS that it did not consider the Overlapping Buyers' issues "just a customer late in payments" but as customers that were "well in default." RX-214.  Further, VTS was aware that Blue Elephant had advised VTP that it would terminate its factoring arrangement with VTP altogether when it expired at the end of 2019.  *Id.*  VTS did not dispute the authenticity of these communications.  I find that the Blue Elephant documents, as well as Blue Elephant's extensive collection activities in regard to unpaid invoices from the Overlapping Buyers, completely discredit Mr.  Sorokin's contention that these Buyers were merely holding back their cash from VTP because they were in a "commercial dispute" with Blue Elephant that did not reflect on their financial condition.

117.  I find no merit to Mr. Warfel's assertion that the Overlapping Buyers devised a "temporary solution" under which they "paused payments to VTP" but "the risks associated with those limited 'cross-over' buyers was not heightened."  Warfel Stmn't-I at 9.  I conclude, rather, that NUFIC was entitled to elicit truthful information regarding VTS's awareness of financial difficulties its Buyers were experiencing so that NUFIC could make its own reasoned underwriting decisions.   Similarly, Mr. Warfel's statement that the Overlapping Buyers "did not default until the second year of NUFIC's relationship with VTS" elides that the second year of the relationship was covered by the separate 2020 Policy, which was a renewal preceded by an application on which I have found VTS omitted material information and misrepresented the state of its awareness in response to question 4.1.  Warfel Stmn't-I at 10.

118.  Based on all of those circumstances, I find that VTS was aware, through the direct knowledge of its principal officers that the financial condition of a significant percentage of

the buyers whose credit VTS sought to insure had materially deteriorated and their circumstances might reasonably be expected to result in a loss.  I find that VTS's omission of this information in its responses to question 4.1 on the 2020 Policy application violated VTS's representations to NUFIC and its warranties and covenants under the Policy.  I conclude that the omissions in VTS's response to question 4.1 are alone sufficient to render the 2020 Policy void and to negate any duty of NUFIC to pay claims relating to the Claimed Buyers or to refund the premiums VTS paid for that Policy.

### b.   VTS's Material Misrepresentations in the 2020 Policy Application Process

119.   I also find that VTS made material misrepresentations to NUFIC during the 2020 Policy application process, in its certification on the application, in a letter it provided to NUFIC, which NUFIC requested when it issued its Non-Binding Indication, RX-15, and in the policyholder representations recited in the Policy.  I find that VTS's negative response to question 4.1 on the application form misrepresented the state of its knowledge.  Further, I find that VTS's representations in its letter to its broker Meridian Finance dated 26 June 2020 that it was "unaware of any buyers to be included in the policy which are currently in financial difficulty" also constituted a misrepresentation.  RX-16. VTS did not dispute that this letter was prepared in response to the Non-Binding Indication letter for transmittal to AIG or NUFIC, which required such "written confirmation" prior to binding coverage.  RX-15 at 6.

120.   In light of my findings that VTS made material misrepresentations in regard to whether there had been a material deterioration in the financial condition of any of its Buyers, I need not reach NUFIC's contention that VTS's representations that "no material fact relating to the transactions hereinabove has been withheld" in its Proof of Loss forms were false.  See e.g., RX-224.  Further, I note, but do not rely on,  NUFIC's contentions that VTS's representations also were false because it did not disclose that Red Phone had advised Mr. Sorokin that it had been the victim of identity theft.

### c.   Materiality and the Consequences of VTS's Omissions and Misrepresentations

121.   VTS was on explicit notice that the information NUFIC sought in the application process would be the basis for its agreement to issue renewal coverage and that it would rely on VTS's representations.[15]   There also was strong factual evidence in the arbitration that NUFIC would not have issued the 2020 Policy, or would have issued it on different terms, if VTS had provided the information called for by the application and made accurate representations to NUFIC.  TR-353 (Meza) (underwriters require full and complete information to assess the risk and determine whether or not they want to offer a policy or… what the terms of that policy should be.'); TR-536 (Bergmann) (disclosure required in the underwriting process and would have significantly changed how we looked at the policy).[16]

122.   VTS provided no legal authority to support its contention that NUFIC failed to establish that the information called for by question 4.1 on the application was material because it did not provide its underwriting manual or the testimony of its underwriter. I do not consider that it follows from NUFIC's choice not to offer evidence that VTS's itself characterized as "typical", not mandatory, that NUFIC failed to meet its burden to show materiality. CPostHB 2.  I find that NUFIC's offered substantial proof, primarily through the testimony of Ms. Meza and Mr. Bergmann, that had VTS provided accurate information regarding the Overlapping Buyers on the application, NUFIC would have issued the 2020 Policy on different terms or would have declined the coverage.  TR-353 (Meza) (Underwriters require full and complete information on the application "to accurately assess the risk and determine whether or not to offer a policy or… what the terms of that policy should be."); TR-536 (Bergmann) (Disclosure that the Overlapping Buyers were in default to VTP "would have been substantial in our underwriting review. …And it would have significantly changed how we look at the policy after that."); Bergmann Stmn't-I ¶¶18, 49 (Underwriting is necessarily guided by the insured's and the broker's representations and the documents presented).   I conclude that this testimony was sufficient to establish the materiality of the information question 4.1 sought to elicit.

---

[15] RX-14 at 3 ("[I t is agreed that this application will be basis of the contract should a policy be issued…")

[16] Notably, the record reflects that Mr. Bergmann had at least some role in the underwriting process. Bergmann Stmn't-I ¶15; RX-241.

123.  I also find that NUFIC's experts testified credibly that applicant disclosure is fundamental to the underwriting process because it enables the carrier to "accurately assess the risk and determine whether or not they wanted to offer a policy or… what the terms of that policy should be.") (Deumler).   NUFIC provided substantial legal authority, not disputed by VTS, that omissions are material as a matter of law when they prevent an insurance company from exercising its choice of whether to accept or reject an application.  *Geer v. Union Mut. Life Ins. Co.,* 273 N.Y. 261, 266 (1937).

124.  Further, an insurer's specific inquiry into a matter, such as question 4.1 on the 2020 Policy application, indicates that such inquiry is material.  *Banco Bradesco S.A. v. Steadfast Ins. Co.,* 2018 WL4284315 at *9 (S.D.N.Y. 2018).  The record in this arbitration shows unambiguously that NUFIC sought information regarding VTS's knowledge regarding the financial condition of its Buyers multiple times and multiple ways.

125.  I also note that the 2020 Policy application that VTS signed stated expressly that it would form "the basis" of the contract if a policy were to issue.   I find this statement to constitute an agreement by VTS and NUFIC that the information the application sought to elicit was material to NUFIC's determination whether or not to issue a policy and on what terms.  I find that VTS and NUFIC are bound by that agreement.

126.  I conclude on the basis of all the foregoing that VTS's omissions and misrepresentations were material.

127.  Further, VTS also was on notice, and the 2020 Policy provided in General Condition H, that then Policy would be cancelled and coverage denied based on any concealment, misrepresentation, non-disclosure, or fraud in connection with the insurance or 'the procurement thereof".  I find on this basis that the consequence of VTS's omissions and misrepresentations is to void the 2020 Policy.  It follows, by the terms of the Policy, that NUFIC is not required to pay the claims or refund the premiums VTS paid.

**B.  Issue 2: Did NUFIC fulfill any duties it may have had to VTS in NUFIC's underwriting of the Policy?**

**1)  Parties' Positions**

**VTS**

128.  NUFIC had an underwriting obligation running to VTS under the common law and based on representations it made regarding its value-added services for trade credit insurance clients.  NUFIC had a duty to conform its actions to its advertising and therefore to provide "unparalleled local underwriting and policy servicing capabilities" to VTS.  CPostHB 17-18. With a named buyer trade credit policy, such as the one VTS purchased, the insurer makes the credit determination as to specific buyers and qualifies the buyers.  TR-751 (Duemler). Allianz, the former employer of NUFIC's expert Jochen Duemler, states that it is the credit insurer's responsibility to proactively monitor its customers' buyers to ensure their continued creditworthiness. CPostHB 17-20.

129.  Under the implied covenant of good faith and fair dealing implicit in all contracts, a contract encompasses any promises that a reasonable promisee would understand to be included. Here, VTS reasonably understood that NUFIC would conduct a reasonable underwriting process to qualify the named Buyers and monitor their financial condition during the policy term to protect VTS against default. *Id.* at 21.

**NUFIC**

130.  The record established that NUFIC properly performed its underwriting functions, including establishing buyer and policy limits based on the financial information VTS provided, and obtaining credit rating information regarding the lawfully established entities in whose names VTS sought trade credit insurance.  RPostHB 15.

131.  The position that NUFIC's underwriters were responsible for protecting VTS from unworthy buyers would render redundant the numerous Policy provisions that required VTS to identify, address, and/or disclose to NUFIC circumstances that might result in future losses under the Policy.   VTS's expert was unable to identify any source of an alleged

underwriting duty of NUFIC running to VTS. VTS's reliance on online marketing materials from Allianz Trade, an unrelated insurance carrier, that VTS submitted into evidence are not relevant and, in any event, do not suggest that trade credit underwriters owe a duty to protect their insured form operational fraud. Allianz and witnesses at the hearing made clear that the underwriting function is inextricably intertwined with and dependent on the insured's provision of accurate information. *Id.* 15-16.

132.  Further,  neither VTS nor its broker Meridian actually expected NUFIC to protect VTS from "bad buyers".   It was undisputed that VTS had been doing business with the Claimed Buyers for years before seeking trade credit insurance from NUFIC and that it sourced its customers primarily from LDI. VTS onboarded customers very quickly, concededly without any meaningful due diligence, and before receiving any input from NUFIC's underwriters. *Id.* at 17-18.

### 2) Discussion

133.  I find that VTS has failed to establish that it was entitled to benefit from NUFIC's underwriting process, or to rely upon NUFIC to prevent it from doing business with "bad buyers."

134.  VTS has provided no legal authority to support its position that a carrier's underwriting duty runs to the applicant. More specifically, VTS has provided no authority to support its sweeping contention that under the common law or by virtue of AIG's advertising, NUFIC had an obligation running to VTS to conduct a reasonable underwriting process to qualify the Claimed Buyers for the benefit of VTS and monitor their financial condition during the policy to protect VTS against default. Further, VTS has provided no authority to support that such duty, even if it were found to exist, would exonerate VTS from omitting to provide information directly called for by a question on the 2020 Policy application or from providing misleading or inaccurate responses to application questions.

135.  I find that the New York cases VTS cites regarding an insurer's obligation to investigate and pay claims in good faith do not speak to the underwriting process and provide no

support for its position regarding NUFIC's underwriting obligations.  I agree with NUFIC that to find an underwriting duty of the scope VTS claims, running to the benefit of a policy applicant, would upend the typical application process.  I find, based on the expert evidence in this arbitration, that in the typical policy application process, including NUFIC's applications in this case, underwriting is carried out in substantial part based on information the applicant provides and on which the carrier is entitled to rely in making its underwriting decisions.

136.   I disagree with VTS's and Mr. Warfel's positions that NUFIC had an underwriting duty to VTS and that NUFIC's "negligence is the proximate cause of the losses at issue."  Warfel Stmn't-I at 6.  While the interests of the carrier and the applicant may be somewhat aligned in the underwriting process in that the carrier's trade credit insurance underwriting decision may in some instances spare an applicant the injury of trading with a "bad buyer", that alignment does not establish that the carrier owes an underwriting duty to the policy applicant.

137.   I also find that VTS has not established that a carrier duty to underwrite for the benefit of the insured arises from an implied covenant of good faith and fair dealing.  I find that the Policy and NUFIC's application process substantially fully define the Parties' rights and obligations in respect to the trade credit insurance at issue.  I consider that the explicit provisions of the application, the 2020 Policy, and related documents therefore leave at most a narrow scope for the implied covenant to apply.  As noted, the application process is structured fundamentally around the provision of information by the applicant and the carrier's right, acknowledged on the face of the application, the Policy itself, and the Non-Binding Indication Letter, to rely on the information provided by the insured.

138.   I do not accept that a broad additional, and in fundamental respects inconsistent, duty running from the carrier to the insured may be predicated on the implied covenant. To the extent that the implied covenant of good faith and fair dealing encompasses any promises that a reasonable promisee would understand to be included, I find that VTS has not established that a reasonable policy applicant would understand that an insurance policy

46

encompasses a promise by the insurer to perform underwriting on behalf of the applicant, or its insured, to qualify the applicant/insured's buyers for the benefit of the applicant, or to monitor their continuing creditworthiness on behalf of the insured.

139.   I find the excerpts from the Allianz website that VTS submitted to be largely irrelevant and certainly insufficient standing alone to prove the existence of the reverse underwriting duty on which VTS seeks to rely.  Further, even assuming for purposes of argument that some sort of underwriting duty running from the carrier to the applicant or insured might exist in some circumstances, as to which VTS has provided no legal authority, VTS has provided no authority to support that such a duty would negate the well-established duty of policy applicants and insured to provide truthful disclosure to the insurance carrier in response to specific questions and not to omit information clearly called for by such questions.

140.   I also reject VTS's contention that NUFIC's advertising gave rise to any underwriting duty to the insured or that VTS was entitled to rely on the general promotional language in NUFIC or AIG's advertising of trade credit insurance for any purpose.  Notably, VTS has provided no persuasive legal authority to support its contention that a carrier's advertising may be construed as a promise that is part of the insurance policy.

141.   Even assuming, for purposes of argument, that an insured could in some circumstances establish a legal basis to rely on statements made in an insurer's advertising, I find that the actual AIG advertising on which VTS predicates its alleged reliance is so general and ambiguous that it could not rise to the level of an enforceable promise.  The language speaks generally to "underwriting capabilities", which, in addition to arguably describing its capacity to make reasoned underwriting determinations based on diligent investigation, also, or alternatively, could speak to the kinds or scope of risks AIG might undertake, or its financial capacity to underwrite policies.

142.   I find that the language in AIG's advertising on which VTS purports to rely cannot reasonably be construed to describe the services any AIG company would provide to policy

applicants or policyholders, either at policy inception or during its term. I find that AIG's advertising is ambiguous, not specific enough, and not in a context where it would reasonably be construed to constitute a representation or promise to perform any particular service to or on behalf of the applicant. Moreover, as noted above, VTS cannot credibly claim that advertising, however broadly construed, can be read to negate the insured's obligation to i) respond truthfully and without material omissions to specific questions on a policy application; ii) provide information expressly called for elsewhere in the underwriting process, including that sought by NUFIC's Non-Binding Indication Letter; or iii) comply with the warranty provisions of the Policy itself.

143. Based on all of the foregoing, I conclude that VTS has failed to establish that NUFIC had an underwriting duty running to VTS to financially qualify VTS's Buyers and monitor their financial condition during the policy term.

### C. Issues Not Reached

144. For the reasons, discussed above, I conclude that the claims and defenses in this arbitration may be completely resolved based on my determination of VTS's disclosure obligations during the renewal application process and VTS's claims regarding NUFIC's underwriting duties.

145. Having determined VTS's claims on the foregoing basis, I do not find it necessary to address NUFIC's coverage defenses that are premised on fraud, including i) whether the transactions for which VTS seeks insurance coverage were "valid and legally enforceable" obligations of "Buyers" within the meaning of the Policy because some of the Buyers may have been victims of identity theft and VTS's invoiced call volume to Zambia could not be reconciled with actual telecommunications activity in that country; and ii) the many interconnections among LDI, the Claimed Buyers, and possibly Lou Arriola. I do note that

there was substantial evidence in this arbitration, at least some of it undisputed, or even validated by VTS, that the underlying transactions were permeated by fraud.[17].

146.  Further, I find it unnecessary to determine whether VTS was required to disclose that all of the Claimed Buyers were referred by LDI, the reasons that LDI  and the Claimed Buyers simultaneously defaulted on their obligations to VTP,  or the implications of VTS's dealings with Teleescrow or Mr. Arriola's promissory note to Voice Funding covering VTS's unpaid invoices to the Claimed Buyers.   I also find it unnecessary to determine whether VTS prevented or minimized its losses to the extent required by the Policy because it concededly performed little or no diligence on the financial capabilities of its Buyers.  For the same reason, I do not find it necessary to determine whether Voice Tele Services' business operations that were disclosed to NUFIC constituted "eligible shipments" within the meaning of the Policy or the related issue of whether the coverage provided under the Policy would have been illusory if the foregoing question were to be answered in the negative.

## IX.    Fees and Costs

### A.  The Parties' Positions

147.  By email dated December 8, 2022, the Parties advised the Tribunal of their agreements in regard to costs and the costs submissions. These included  i) confirming their argreement that there is no dispute as to the Tribunal's jurisdiction to award fees and costs in this arbitration; ii) the costs submissions would not be accompanied by any substantive argument; and iii) an agreement on the form of proof to be submitted, which was limited to summary information in various designated categories, without underlying supporting documentation or a sworn statement verifying the amounts.

### B.  Tribunal's Analysis

148.  In assessing whether to assess fees and costs, and the amount, if any, to be awarded, I take into account well-established factors including any relevant agreement of the Parties, relative

---

[17] TR-8 ("No one is going to defend Lou Arriola here.")

success and failure on the merits, the manner in which each Party conducted the arbitration, including the extent to which each Party conducted the arbitration in an expeditious and cost-effective manner,  and the reasonableness and reality of the costs incurred by each Party.  Courts also have recognized that it is appropriate for the finder of fact in fee and cost determinations to apply their own experience and knowledge of the legal marketplace. Based on the Parties' agreement described below not to accompany their costs submissions with any substantive argument, I consider that the Parties have left the analysis to my discretion and find it appropriate to apply the foregoing factors.

149.  In assessing the relative success and failure on the merits, I note that the outcome in this insurance coverage arbitration has been, from the outset, inherently binary.  Both Parties anticipated that the Sole Arbitrator would determine either that the Policy was in place and covered VTS's claims or, alternatively, the Policy was void and did not provide coverage for the claims.  The issues in the case were not such that might have led to a determination that there was partial coverage or other split decision.

150.  For the reasons stated above, after hearing the proof, the Sole Arbitrator has determined that the Policy is void and VTS is not entitled to recover either its claims or the premiums paid.  Accordingly, on the merits, NUFIC is successful and VTS is not.

151.  I find that both Parties conducted the arbitration in a reasonably expeditious and cost-effective manner.  Counsel were cooperative with each other and the Tribunal, worked together to facilitate efficiency, and were highly professional throughout the proceedings. The measures counsel agreed to facilitate efficiency included their agreement to submit written direct testimony, the preparation of well-organized hearing materials, their agreement to take some testimony by videoconference during the live hearing proceedings, and their cooperation in completing the live hearing in two long hearing days rather than a more extended proceeding.   I consider below in more detail whether the proceedings were cost-effective.

152.  I find it significant to the analysis that both Parties sought fees and costs in the arbitration, notwithstanding that both are domestic corporations and under the "American System" would not necessarily have an expectation of fee-shifting.

153.  I find the most significant issue in the analysis of fees and costs in this arbitration to be the reasonableness and reality of the costs incurred by each Party.   I note that NUFIC's fees and costs were very substantial and far in excess of those incurred by VTS.  Further, the fees and costs were large in proportion to the monetary amount in dispute in this arbitration.  As against that facial disparity between the Parties' fees and costs and the relationship of fees and costs to the amount at issue, I note the following additional factors, some of which explain and offset the large amounts expended and the disparity between the Parties' expenditures:

- The issues in this arbitration were of obvious business significance to both Parties. For Claimant, the denial of coverage arguably contributed to VTS's inability to continue its operations.  For NUFIC, the arbitration raised important issues of principle, including the fundamental importance of truthful disclosure in policy applications and the need to be vigilant in regard to fraud associated with the businesses to which it provides coverage.

- I find that it was reasonable for NUFIC to retain the fact and expert witnesses that it presented in the arbitration, including the witnesses who addressed the fraud and identity theft issues I did not find it necessary to resolve to determine the case.

- Although I did not find it necessary to reach many of the fraud-related and identity theft issues addressed in NUFIC's investigation of the claims at issue here, and I stress that I have made no determination in regard to whether VTS was aware of and/or participated in any such activities, I consider it reasonable that NUFIC found it necessary to address such issues in depth in its investigation and in the arbitration. Further, it was obvious in the arbitration that the fraud and identity theft issues were both factually and legally complicated.  The difficulty of investigating and presenting the relevant proof was undoubtedly complicated by the complex international telecommunications business setting and the absence and lack of cooperation of various participants, including in particular Mr. Arriola.  It follows that it is

unsurprising that NUFIC incurred substantial legal fees and costs on these aspects of the case.

- I note that NUFIC has not claimed the costs of its pre-arbitration investigation of the claims.

- I also note that NUFIC's counsel did not bill NUFIC or claim in this arbitration the legal fees of its most senior counsel in the arbitration. On that basis, counsel did not charge for more than $400,000 in fees actually incurred in the case. I note that this attorney had a significant and continuing role throughout the arbitration. Further, I do not consider that the matter was overstaffed, taking into account the complexity of the issues and their business importance to NUFIC.

- I consider that the large disparity between the hourly rates of the Parties' counsel is a function of their respective choices of counsel and geographic differences in prevailing fee structures. Although NUFIC's counsel charged relatively high hourly rates, in the experience of the Sole Arbitrator, the hourly rates are consistent with, and in some instances, lower than the prevailing market for large firms in the national marketplace.

154. Taking into account all of the foregoing and in the exercise of my discretion, I find it appropriate to make a substantial fee and costs award to NUFIC, but significantly less than the entire $1,421,551.55 amount NUFIC sought, as follows:

  a. I will award legal fees of $300,000 of the total $1,225,599 incurred and paid.

  b. I will award the fees and expenses of $53, 834.00 of NUFIC's two expert/fact witnesses whose testimony was directed to the insurance and underwriting issues that VTS raised in the case. I will not award the fees of NUFIC's fact witness on the fraud and identity theft issues, although, for the reasons discussed above, I have found it reasonable that NUFIC addressed these issues in the arbitration.

155. Noting that the Parties' arbitration agreement quoted above provides that "Each party shall bear the expenses of its designated appraiser and shall jointly and equally share with the other the expense of the umpire and of the arbitration", I find it appropriate each Party bear half of the administrative expenses of the AAA, the hearing and support services expenses, including the expenses of the court reporter, and the fees of the Sole Arbitrator.

## X.    Final Award

## AWARD

For the reasons stated above, the Sole Arbitrator makes the following Award:

a.  Voice Tele Services Inc.'s requests for relief are denied in their entirety and its claims in this arbitration are dismissed with prejudice.

b.  National Union Fire Insurance Company's request for declaratory relief is granted, to the extent that the Tribunal finds and declares that:

1.  National Union Fire Insurance Company's denial of Voice Tele Services Inc.'s insurance claims under the 2020 Policy was justified and Voice Tele Service Inc.'s claims are not entitled to coverage.

2.  The 2020 Policy is void.

3.  Pursuant to the terms of the Policy, the premiums Voice Tele Services Inc. paid under the Policy are forfeited and National Union Fire Insurance Company is not required to repay the premiums to Voice Tele Services Inc.

c.  Voice Tele Services Inc.'s request for its costs and fees in this Arbitration is denied.

d.  National Union Fire Insurance Company is awarded $300,000 in fees and $53, 834 in costs.

e.  The administration fees and expenses of the AAA, totaling $19,655, and the compensation and expenses of the arbitrator, totaling $78,150, shall be borne equally. Therefore, National Union Union Fire Insurance Company owes Voice Tele Services Inc. the amount of $7,997.50.   National Union Fire Insurance Fire Insurance Company may satisfy that obligation by providing Voice Tele Services Inc. an offset

to the legal fees and costs that have been awarded to National Union Fire Insurance Company.

    f.   This Award is in full settlement of all claims and counterclaims submitted in this Arbitraton.  All claims not expressly granted herein are hereby denied.

This Final Award may be transmitted in electronic form.

Dated: April 7, 2023

_____

Mark C. Morril
Sole Arbitrator

I, Mark C. Morril, do hereby affirm upon my oath as Arbitrator, that I am the individual described in and who executed this instrument which is my Final Award.

Dated: April 7, 2023                    _____

Mark C. Morril